## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KELLIE FARRIS,

     Plaintiff,

                                       Case No. 20-10295

v.                                   HON. DENISE PAGE HOOD

OAKLAND COUNTY, *et al.*,

     Defendants.

_____/

## ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [ECF No. 27]
## and
## DISMISSING ACTION

I.     **INTRODUCTION**

     This lawsuit arises out of the arrest of Plaintiff Kellie Farris by Oakland County Sheriff deputies on March 31, 2019.  On July 6, 2021, Defendants filed a Motion for Summary Judgment. [ECF No. 27]  The Motion has been fully briefed, and a hearing was held on September 16, 2021.  For the reasons that follow, Defendants are entitled to summary judgment on all claims, and Plaintiff's cause of action is dismissed.

1

## II.    BACKGROUND

In considering the Motion for Summary Judgment, the Court must view all of the facts in a light most favorable to Plaintiff.  The following version of the "facts" is consistent with that obligation.  The Court is not limited to including only those "facts" as represented by Plaintiff, and additional relevant "facts" are included in order to assess whether the individual defendants are entitled to qualified immunity.

Plaintiff is a 29-year-old single mother of two minor children. Antoine Kyles is the father of one of Plaintiff's two children and was dating a woman named Danniqua Franklin on March 31, 2019. On that day, Ms. Franklin walked into Plaintiff's residence and began threatening Plaintiff. Plaintiff told Ms. Franklin that she needed to leave her house and Ms. Franklin left. Plaintiff tried calling Mr. Kyles after Ms. Franklin left her residence, but he did not answer. Since Mr. Kyles did not answer his phone, Plaintiff drove up the street to Mr. Kyle's mother's house, which is where Mr. Kyles resided. (Id. at p. 55).

Upon arriving at Mr. Kyles residence, Plaintiff did not initially see Ms. Franklin's car.  While Plaintiff was in her car, Ms. Franklin came out from between two cars, ran up to Plaintiff's car, and began kicking Plaintiff's car, which caused Plaintiff's car to be dented. Plaintiff claims she backed up her car to get away from Ms. Franklin, parked, called 9-1-1, and spoke to the operator until law enforcement

arrived. Plaintiff told the dispatcher that Ms. Franklin had kicked her car and damaged her car. Plaintiff was advised by the 9-1-1 operator to remain in her car, and she has stated that she never left her car until after law enforcement arrived on scene.

Defendants Mendicino and Winborn were dispatched to the scene on the malicious destruction of property call. Plaintiff was in her car when Defendants Mendicino and Winborn arrived.[1] Plaintiff told Defendant Mendicino what happened at her house earlier with Ms. Franklin and how Ms. Franklin kicked her car and damaged her car. Plaintiff also talked to Defendant Winborn and told him that Ms. Franklin kicked and damaged her car in the front and back. Defendants Winborn and Mendicino saw the damage to the front and rear of Plaintiff's vehicle. As Plaintiff claims, it is a crime of malicious destruction of property to damage another individual's vehicle.

Defendants Winborn and Mendicino also talked to Ms. Franklin to understand her side of the story regarding what transpired in the parking lot of Mr. Kyles' mother's residence. Ms. Franklin told Defendant Winborn that Plaintiff attempted to

---

[1] From this point until Plaintiff was removed from Defendant Winborn's squad car at the Oakland County Jail, there is an audio recording of almost all events described during that period (and a squad car video that captures a few of those events).

hit her with her car twice and Plaintiff got out of her car and displayed in a threatening manner a purple or silver knife or purple or silver scissors. Ms. Franklin then described what would be the shape of scissors to Defendant Mendicino (and not the shape something that was the shape of a knife). Ms. Franklin admitted to kicking Plaintiff's car but claimed that it was in self-defense. Plaintiff denied Ms. Franklin's version of events and claimed Ms. Franklin was lying.

Plaintiff consented to a search of her car, and she represents that she informed Defendant Winborn prior to the search that she had scissors and a pocketknife in her car. Plaintiff reports that the scissors were her children's scissors. A search was conducted of Plaintiff's car, and three scissors and a three-inch pocketknife were found. After talking to Plaintiff and Ms. Franklin, Defendant Mendicino acknowledged that the women had their own version of events as to what occurred. Both Plaintiff and Ms. Franklin provided written statements at the scene, and both of their statements comported to what they told Defendants Winborn and Mendicino. Defendant Winborn attempted to talk to Mr. Kyle, however, Mr. Kyle was uncooperative and did not corroborate Plaintiff's version of events or Ms. Franklin's version of events. There were no other witnesses to the aforementioned events that took place on March 31, 2019.

4

Defendants Winborn and Mendicino called Sergeant Hunt from Oakland County Sheriff's Department to discuss the situation. During the discussion, Sergeant Hunt said that making an arrest "will stop them from doing dumb shit in the future." Sergeant Hunt suggested, and Defendant Winborn agreed, that arresting one or the other would "solve a problem." Sergeant Hunt also advised that if it is determined that Plaintiff did not follow Ms. Franklin to the scene, to go with whatever you feel is the stronger case. Defendant Winborn admitted in his deposition that for the sake of just solving a problem and contact between two people, an officer cannot make an arrest on that basis solely. After the Defendants' conversation with Sergeant Hunt, Defendants Winborn and Mendicino decided to arrest Plaintiff. Defendant Winborn arrested Plaintiff for aggravated felonious assault with a weapon.

On the ride to the Oakland County Jail ("OCJ"), Plaintiff kept telling Defendant Winborn that she did not do anything. Shortly after Defendant Winborn and Plaintiff left the scene in Winborn's patrol vehicle, Defendant Winborn observed Plaintiff rolling her head and wrapping the seat belt three to four times around her neck and making a gurgling sound. ECF No. 27, Ex. C at 56. Defendant Winborn then called out over the radio that Plaintiff was attempting to hang herself, stopped and exited the vehicle, opened the rear door and unwound the seat belt from around

5

Plaintiff's neck. *Id.* at 57.  During this time, Defendant Winborn heard Plaintiff state that she wanted to kill herself. *Id.* at 57.  Plaintiff was handcuffed at this point in time during transport. *Id.* at 59.  Defendant Winborn communicated Plaintiff's actions and statements to supervisors and stopped the vehicle to await assistance.

Sergeant Hunt and multiple other deputies arrived at the scene, along with an ambulance and paramedics. Sergeant Hunt made the decision to have Defendant Mendicino, who is a female deputy, ride with Plaintiff in the back seat during the remainder of the transport to Oakland County Jail. *Id.* at 59-60.  While in the backseat for the duration of the transport, Defendant Mendicino attempted to hold Plaintiff by her shoulders so she could not wrap the seatbelt around her head. ECF No. 27, Ex. B at 70. When Defendant Mendicino would remove her hands from Plaintiff, Plaintiff would attempt to wrap the seatbelt around her head. *Id*.

The Booking Supervisor for OCJ notified Defendant Sergeant Jordan that Plaintiff was uncooperative and actively attempting to strangle herself while en route to the OCJ. ECF No. 27, Ex. D at 6. As a result, the OCJ Cell Extraction Team ("CET") was activated to escort Plaintiff to her cell. (Exhibit D, p. 6).  Upon arrival of Defendant Winborn's patrol vehicle at the OCJ, the CET led by Defendant Ogans was inside the sally port of the Oakland County Jail waiting for Plaintiff's arrival. ECF No. 27, Ex. C at 63).  There are a number of different witness accounts and/or

video and audio recordings of what transpired after Defendant Winborn's patrol vehicle arrived at the OCJ.

Per the dash cam audio from Defendant Winborn's patrol vehicle, the following verbal exchange takes place between Plaintiff and a deputy shortly after arriving at the OCJ:

| Plaintiff: | Let me go. |
|---|---|
| Deputy: | Just step out. |
| Plaintiff: | Let me go. No. |

ECF No. 27, Ex. E at 1:31:04.[2]

Immediately after Defendant Winborn arrived in his patrol vehicle at OCJ with Plaintiff in the backseat, Defendant Deputy Fitzpatrick, who was a member of the CET, observed Defendant Winborn standing at the passenger rear door attempting to gain control of Plaintiff in the back seat. ECF No. 27, Ex. F at 27-28. Defendant Fitzpatrick heard Defendant Winborn say something to the extent of "get her" and at that time Defendant Fitzpatrick observed Plaintiff with the seatbelt wrapped around her neck. *Id.* at 29.

Pursuant to OCJ policy, the entire extraction – and the balance of Plaintiff's interactions with the individual Defendants that is the subject of this cause of action

---

[2] This is the end of the audio/video recording from Defendant Winborn's patrol vehicle.

-- was recorded on video with audio by Defendant Sergeant Jordan. The video begins with the CET approaching Defendant Winborn's patrol vehicle. ECF No. 27, Ex. G at 0:00:01. Plaintiff is forcibly pushed out of the vehicle after the seatbelt is removed from her neck by Defendant Fitzpatrick. ECF No. 27, Ex. F at 32; Ex. G at 0:00:18. Plaintiff was secured by the CET and placed in the cell extraction escort position. ECF No. 27, Ex. H at 21; Ex. F at 34. This cell extraction position is used when an individual is uncooperative and a deputy takes control of the head by placing the palm of their hand on the chin, the other hand rests on the back of the head, and the individual is bent over at the waist in order for a custody search to take place. ECF No. 27, Ex. F at 34-35.

Plaintiff claims that, before she was asked to exit the vehicle or if she would cooperate, the CET forcibly removed Plaintiff from the vehicle. As Plaintiff was removed from the vehicle, her knee gave out. Plaintiff was placed in a headlock by Defendants, and one hand was placed on her throat and the other on her head. The deputy that had Plaintiff in a headlock was squeezing her neck under her jawbone. A spit hood was immediately placed on Plaintiff's face and head after she was taken out of Defendant's Winborn's vehicle.

According to Defendants Michal and Wurfel, it is standard practice for the cell extraction team to use a spit mask for all cell extractions, although Defendant

Mark Bowering testified that it is not county policy that everyone on CET shall place a detainee in a spit hood. Plaintiff states that she did not spit on anyone or threaten to spit on anyone prior to the spit mask being placed over her head. Plaintiff states Defendants held both of her arms and her head was being forcibly held at that time. Plaintiff claims that she was not resisting the deputies at all in the video. Plaintiff was placed in the cell extraction escort position and is patted down. Plaintiff did not threaten law enforcement. Plaintiff never threatened to spit on any deputies.

After the spit hood was forced onto Plaintiff's head, her head was held down while another Defendant was trying to push her head and arms up while squeezing her throat and, according to Plaintiff, choking her. Plaintiff began yelling that she "can't breathe."  Since the moment the spit hood was put over Plaintiff's face, she consistently told Defendants that she "can't breathe:"

- It's over my nose. I can't breathe. (ECF No. 36, Ex. J at 02:55).

- Why can't I put my head down? Let go of my neck. Let go of my neck. I'm not resisting. I can't breathe. It hurts. (*Id.* at 03:24).

- I can't breathe and I'm pregnant. (*Id.* at 03:59).

Defendants acknowledged that Plaintiff repeatedly stated that she could not breathe.

When asked, Plaintiff told the Defendants that she has asthma.  After the spit hood was forced on Plaintiff and during a pat down, she told them that she was pregnant, at which point Plaintiff was put into a wheelchair.  Defendants continued

9

to apply pressure to Plaintiff's neck, head, and/or face at various times. One Defendant also placed his thumb into Plaintiff throat. While being transported to the cell, a Defendant was squeezing Plaintiff's nose with his index finger and thumb while she was wearing the spit mask for approximately one to two minutes. Plaintiff never attempted to get out of the wheelchair, and there was one exchange where a deputy asked Plaintiff to lift up her foot and she responded, "where is the thing at?"

During the transport of Plaintiff to her cell via wheelchair, the following verbal exchange can be heard on video between Plaintiff and a deputy:

| | |
|---|---|
| Deputy: | Ma'am have you been here before? |
| Plaintiff: | Yes. Can you please…Can he get his hand off my throat please…I    mean on my chin…on my chin. |
| Deputy: | His hand is not on your throat it's holding your chin. Listen, just listen to me okay. I got a couple questions I got to ask you. |
| Plaintiff: | How do you want me to cooperate if you guys can't take your hand off my fucking face? |
| Deputy: | Well you're in this position because of what you... |
| Plaintiff: | Because I was trying to kill myself. |
| Deputy: | Well, alright, so that answers my question – you're suicidal. |

ECF No. 27, Ex. G at 0:04:40-0:05:05.  Plaintiff made no threats to deputies as she was being wheelchaired to her cell.  Plaintiff was not told to stop resisting or to comply prior to being placed in the wheelchair. The video does not show any resistance on the part of Plaintiff, and she states that her reactions were in response to the force being used on her.

Plaintiff was taken in front of a cell, was forcibly bent over, handcuffed, and a hand was placed on the back of her head pushing down and pulling it while another hand was put on her throat while taking her to the cell. *Id.* at 6:00.  In the cell, Plaintiff was uncuffed and was told to remove her clothing.  Plaintiff told the Defendants that she would remove her clothing when the male deputies left. A female deputy told Plaintiff that it's "just the two of us" when in truth, there were male deputies standing right behind Plaintiff in the cell.

The male Defendants momentarily stepped out of the cell but stood immediately outside of the cell with the door open. Plaintiff told them that she would not take her clothes off because the camera was recording at the time. The Defendant male deputies came back inside the cell. Plaintiff agreed to take her clothes off at this point, but Plaintiff was then forcibly handcuffed, and her clothing was forcibly cut off and/or removed.  The male Defendants were present in Plaintiff's cell as her clothes were forcibly removed and she was naked.  Defendant Sergeant Jordan videotaped the entire incident while Plaintiff was inside the cell.

## III.   LEGAL STANDARD

### A. Summary Judgment

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

### B. Qualified Immunity

The individual Defendants argue that they are entitled to qualified immunity, and the Court must consider whether they are entitled to qualified immunity with respect to their alleged conduct.  As recently stated by the Supreme Court:

> The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.  Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

Qualified immunity is a two-step process. *Saucier v. Katz*, 533 U.S. 194 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009). First, the Court determines whether, based upon the applicable law, the facts viewed in a light most favorable to the plaintiff show that a constitutional violation has occurred. Second, the Court considers whether the violation involved a clearly established constitutional right of which a reasonable person in the defendant's position would have known. *Id.*; *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). The Court need not decide whether a constitutional violation has occurred if it finds

that government official's actions were reasonable. *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010).  Only if the undisputed facts or the evidence, viewed in a light most favorable to the plaintiff, fail to establish a prima facie violation of clear constitutional law can the Court find that the Defendants are entitled to qualified immunity. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).  The Sixth Circuit Court has held that "qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violate the law." *Pollard v City of Columbus*, 780 F 3d 395, 402 (6th Cir.2015) (citations omitted).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted). A plaintiff also must establish that each individual defendant was "personally involved" in the specific constitutional violation. *See Salehphour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); *Bennett v. Schroeder*, 99 F. App'x 707, 712-13 (6th Cir. 2004) (unpublished) ("It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants").

14

## IV.   ANALYIS

### A.        Unreasonable Searches and Seizures

Count One of Plaintiff's Complaint alleges that Defendants violated Plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment because they lacked probable cause to arrest Plaintiff.  The individual Defendants argue that they are entitled to qualified immunity with regard to Plaintiff's unreasonable search and seizure claims.  They contend that there is no authority that dictates that an officer may not arrest someone such as Plaintiff who is claimed to have assaulted the victim with a knife when a knife is found in Plaintiff's possession.  Defendants assert that, on this basis alone, Plaintiff's Fourth Amendment claim fails as a matter of law because Plaintiff cannot show her rights were "clearly established." *Ashcroft*, 131 S. Ct. at 2080.  The Court agrees.

As Defendants state, the Supreme Court of the United States has held that probable cause exists when the police have "reasonably trustworthy information [that is] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense" based on "the facts and circumstances within [the police's] knowledge" at the moment in question. *Beck v Ohio,* 379 U.S. 89, 91 (1964); *Peet v. City of Detroit*, 502 F.3d 557, 563–64 (6th Cir. 2007).  "An eyewitness identification will constitute sufficient probable cause unless, at the time

of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what she had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers*, 188 F.3d at 370.

The Court finds that there are several objective factors that establish probable cause for the arrest of Plaintiff for felonious assault. Defendants Mendicino and Winborn did not take Ms. Franklin's allegation against Plaintiff at face value, nor did they take Plaintiff's allegation against Ms. Franklin at face value. Both Plaintiff and Ms. Franklin were interviewed by the deputies. As a result of Ms. Franklin's statement that she kicked Plaintiff's car twice out of self-defense and then was threatened by Plaintiff with a knife, Defendant Mendicino asked Plaintiff if she had a knife. Plaintiff admitted to having scissors in her vehicle, and she states that she indicated having the knife, too. The deputies then asked Plaintiff for consent to search her vehicle, and Plaintiff consented to the search of her vehicle.

Upon searching Plaintiff's vehicle, Defendant Mendicino discovered a pocketknife concealed between the visor and the moon roof. The discovery of the knife gave credence to the veracity of Ms. Franklin's statements. The physical evidence of a concealed knife in Plaintiff's vehicle, combined with Ms. Franklin's firsthand description of Plaintiff's assaultive behavior with the knife and driving the vehicle at Ms. Franklin provided the basis for probable cause that Plaintiff had

16

committed the crime of felonious assault. [3] *Carroll v. United States*, 267 U.S. 132, 162 (1925) ("When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would warrant a man of reasonable caution in the belief that an offense has been committed.").

Plaintiff argues that there was no probable cause to arrest her for felonious assault as she: (a) denied Ms. Franklin's version of events and claimed Ms. Franklin was lying; (b) never admitted at any time that she tried to run over Ms. Franklin; (c) denied attempting to hit Ms. Franklin with her vehicle; and (d) never left her car prior to the Defendants arriving on scene. Plaintiff argues that was much different than Ms. Franklin actions, who admitted to law enforcement that she kicked Plaintiff's car and being at Plaintiff's residence where words were exchanged prior to Ms. Franklin kicking and damaging Plaintiff's car. Plaintiff also asserts that, due to the fact that Ms. Franklin and Plaintiff were friends who hung out occasionally (which was communicated to Defendant Winborn), Ms. Franklin had knowledge as

---

[3] Pursuant to Michigan Penal Code 750.82, felonious assault is defined as:

> "a person who assaults another person with a gun, revolver, pistol, **knife**, iron bar, club, brass knuckles, or **other dangerous weapon** without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both."

to Plaintiff having her kids scissors and a pocketknife in her car prior to the incident. Plaintiff correctly states that it is legal for an individual to have scissors and a three-inch pocketknife in their vehicle.

For the reasons stated above, however, Plaintiff's arguments do not vitiate the existence of probable cause to arrest her for felonious assault.  As the Sixth Circuit has held, law enforcement "is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988). *See also Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001).

The individual Defendants are entitled to qualified immunity on, and the Court grants summary judgment with respect to, Count I.

## B.        Excessive Force

The individual Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's claim of excessive force.  They argue that there is no authority that dictates that an officer may not: (1) handcuff; (2) forcibly remove an uncooperative and suicidal detainee from a patrol vehicle at the jail; (3) perform a cell extraction escort position; (4) use a spit hood; or (5) forcibly strip search an uncooperative and suicidal detainee such as Plaintiff to execute an arrest and transfer

her into the jail.  For these reasons, Defendants believe that Plaintiff's excessive force claims fails as a matter of law. *Ashcroft*, 131 S. Ct. at 2080.

### 1. Handcuff

"In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Morrison v. Bd. of Trustees of Green Twp*., 583 F.3d 394, 400 (6th Cir. 2009).; *Lyons v. City of Xenia,* 417 F.3d 565, 575–76 (6th Cir. 2005).  Defendant contends that there is no evidence that Plaintiff ever complained that the handcuffs were too tight, that Defendants ignored such complaints, or that the handcuffing caused a physical injury resulting from the handcuffing.  They assert there is no controlling precedent which has established that handcuffing an individual upon arrest for a felony violates a clearly established right.  In a light most favorable to Plaintiff, she did state a couple of times the handcuffs were too tight on her wrist, to which Defendants told her to stop [moving].  Plaintiff has not, however, produced evidence of any physical injury to her wrists (not even bruising) as a result of the handcuffing.

Defendants also state that the Supreme Court has held that an officers' right to make an arrest or investigatory stop carries with it the right to use physical force or the threat of, when detaining an individual. *Graham*, 490 U.S. at 396; *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968). The standard for determining what force is considered "excessive" is one of objective reasonableness. *Graham*, 490 U.S. at 397. Courts should look to the facts and circumstances confronting the officer at the scene and "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* Plaintiff fails to allege any facts regarding the detention or the nature in which Defendants conducted the detention which was unreasonable. As stated above, Defendants were carrying out the arrest of Plaintiff and taking precautions to minimize the risk of harm to the officers and to Plaintiff.

For the reasons stated above, the Court finds that none of the individually named Defendants used excessive force in placing Plaintiff in handcuffs and summary judgment is granted with respect to handcuffing Plaintiff.

   *2.  Removal from Defendant Winborn's Squad Car at the Oakland County Jail*

When analyzing excessive force claims, the Fourth Amendment's "objective reasonableness" standard applies from the time of arrest until the completion of a

probable cause hearing. *Aldini v. Johnson*, 609 F.3d 858, 865-66 (6th Cir. 2010).

The Sixth Circuit has explained:

> [The] standard requires that the officer's use of force be objectively reasonable, balancing the cost to the individual against the government's interests in effecting the seizure. This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry.

*Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). The ultimate inquiry is whether the totality of the circumstances justifies the force used. *Id*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979).

Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether

the plaintiff was actively resisting. *Graham*, 490 U.S. at 396; *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).

In this case, Defendant Fitzpatrick observed Defendant Winborn standing at the passenger rear door attempting to gain control of Plaintiff in the back seat. Defendant Fitzpatrick heard Defendant Winborn say something to the extent of "get her" and at that time Defendant Fitzpatrick observed Plaintiff with the seatbelt wrapped around her neck. Plaintiff was then forcibly pushed out of the vehicle after the seatbelt was removed from her neck by Defendant Fitzpatrick. ECF No. 27, Ex. G at 0:00:18.

The Court finds that, under these circumstances, the Defendants' use of force to remove Plaintiff from the patrol vehicle was justified, as she had been using the seat belt to strangle herself. *Id. See Morrison*, 583 F.3d at 404 (holding that a central inquiry of the objective reasonableness standard is "whether the law enforcement officer had a legitimate government interest, *i.e.*, justification, to exert force. Because Plaintiff was observed as suicidal, the safety and security issues were great with respect to securing Plaintiff.  For these reasons, the Court finds that no reasonable jury could conclude that there was a "clear lack of an emergency situation" which gave rise to using force to remove Plaintiff from the vehicle. *Hope v. Pelzer*, 5636 U.S. 730, 738 (2002); *Washington v. Ondrejka*, 822 F. App'x 104,

107 (3d Cir. 2020).  The Court concludes that the individual Defendants only used the amount of force necessary to remove Plaintiff from the vehicle so she could be transferred into the jail, such that they are entitled to qualified immunity.

### 3. Pressure on "Neck"

Plaintiff claims that Defendants used excessive force when put their hands on her neck and throat.  In *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012), the court found that the single use of a taser in drive-stun mode when the Plaintiff had already been taken to the ground was not excessive force due to the highly agitated, suicidal and intoxicated state of Plaintiff.  The use of the cell extraction position, in the instant case, to safely secure and transport Plaintiff to her cell involved significantly less force than in *Caie*, and the Court finds that the Defendants used reasonable force to protect Plaintiff from herself and Defendants, due to her highly agitated and suicidal state.

The video in this case does not support Plaintiff's contention that force was exerted on her neck and throat, but the video does not capture Plaintiff's head, neck, and torso at all times.  Defendant Deputy Wurfel can be seen placing the palm of his hand under Plaintiff's chin to stabilize her head and prevent her from standing up or falling out of the wheelchair, while he pushed the wheelchair with his other hand.

ECF No. 27 Ex. G at 0:02:24. Plaintiff recognizes that Defendant Wurfel had his hand on her chin during her transport via wheelchair:

> Deputy:     Ma'am have you been here before?
>
> Plaintiff:  Yes. Can you please…Can he get his hand of my throat please…**I mean on my chin…on my chin**.
>
> Deputy:     His hand is not on your throat it's holding your chin. Listen, just listen to me okay. I got a couple questions I got to ask you.
>
> Plaintiff:  How do you want me to cooperate if you guys can't take your hand off my fucking face?
>
> Deputy:     Well you're in this position because of what you...
>
> Plaintiff:  **Because I was trying to kill myself**.
>
> Deputy:     Well, alright, so that answers my question – you're suicidal.

*Id*. at 0:04:40-0:05:05 (emphasis added).

The cell extraction position is used when an individual is uncooperative and a deputy takes control of the head by placing the palm of their hand on the chin, the other hand rests on the back of the head, and the individual is bent over at the waist in order for a custody search to take place.  Under these circumstances, the Court finds that Defendants' interest in averting another suicide attempt and protecting the safety of the officers, jail staff, and other inmates from an uncooperative detainee justified the use of force applied by Defendants as shown on video to safely transport Plaintiff to her cell. Summary judgment is appropriate.

*4.  Spit Hood*

Plaintiff was suicidal and had been yelling and screaming in Defendant Winborn's squad car from the time he left the scene of the incident.  Plaintiff does not cite any authority that supports a finding that it was clearly established that a suspect under such circumstances has a right to be free from having a spit hood used on her.  The Sixth Circuit has held that spit hoods have their legitimate place in a correctional setting. *Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016).  The mesh spit hood only remained on Plaintiff during transport from the sally port to her cell after the force changed out was completed. ECF No. 27, Ex. G at 0:01:53-0:12:54.  The Court finds that it was reasonable for Defendants to utilize a spit hood under those circumstances.  For these reasons, the Court concludes that Defendants are entitled to qualified immunity and summary judgment as to the use of the spit hood. *Marden v. Cty. of Midland*, No. 15-CV-14504, 2017 WL 1104960, at *7 (E.D. Mich. Mar. 24, 2017); *Scott*, 550 U.S. at 377; *Brown*, 814 F.3d at 457.

*5.  Strip Search*

The Supreme Court has held that even nonindictable offenders without reasonable suspicion may be strip searched. *Florence v. Bd. of Chosen Freeholders*

25

*of Cty. of Burlington*, 132 S. Ct. 1510, 1511 (2012). "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Id*. at 1513. "Facility personnel, other inmates, and the new detainee himself or herself may be in danger if these threats are introduced into the jail population." *Id*. "Detecting and deterring the possession of contraband is a legitimate penological objective." *Id*. at 1517.

Under the circumstances in the instant case, the Defendants' penological interest in ensuring that Plaintiff did not bring in a dangerous object that could harm (especially) herself, other inmates, or jail personnel justified the use of force applied by Defendants during the strip search as shown on video cannot be interpreted as an exaggerated response to the considerations articulated above. *Block, supra*, at 584–585, 104 S.Ct. 3227; *Florence*, 132 S. Ct. 1510, 1511–12 (2012). At no time did any of the Defendants strike Plaintiff or inappropriately invade Plaintiff's body during the forced change out which occurred in her cell where no other inmates were housed. ECF No. 27, Ex. G at 0:07:13.  Plaintiff has not set forth any evidence that any inmates or other jail personnel who were not assisting with or videotaping the extraction observed the forced strip search of Plaintiff.  The Court finds that the force

used by Defendants while conducting the forced change out, the manner in which it was conducted was objectively reasonable, and summary judgment is appropriate.

### 6. Conclusion

For the reasons set forth above, the Court concludes that each of the individually named Defendants is entitled to qualified immunity as to Plaintiff's claims of excessive force and grants summary judgment on Count II.

## C. Oakland County's Constitutional Violations – *Monell* claim

Defendant Oakland County argues it is immune against Plaintiff's tort claims under the Michigan Governmental Tort Liability Act, M.C.L. § 691.1401 *et seq.* ("GTLA"). Under the GTLA, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." M.C.L. § 691.1407(1). Oakland County is a "governmental agency" under the GTLA, *see North v. Macomb Cnty.*, No. 10-11377, 2011 WL 4576848, at *5 (E.D. Mich. 2011) (citing M.C.L. § 691.1401(a)–(d)), and "the operation of a law enforcement agency is a governmental function." *Wright v. Genesee Cty. Corp.*, 659 F. Supp. 2d 842, 852 (E.D. Mich. 2009).  Oakland County therefore believes it is immune from Plaintiff's tort claims because the claims arose from its operation of its law enforcement agency, the Oakland County Sheriff's Office ("OCSO").

The law is well established with respect to municipal liability: "It is only when the execution of a government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *Monell v New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994).  Plaintiff must establish that "through its deliberate conduct, the [County] was the 'moving force' behind" the violation of her constitutional rights. *Gregory v. Shelby County*, 220 F.3d 433, 442 (6th Cir. 2000).  A plaintiff must show an underlying constitutional violation in order to succeed on a municipal liability claim. *SL v. Pierce Twp. Bd. of Trustees*, 771 F3d 956, 963 (6th Cir.2014).

To demonstrate municipal liability, Plaintiffs must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that their particular injury was incurred due to the execution of that policy. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).  The only policy or custom referenced in this matter is OCSO's cell extraction policy, use of force policy and strip search policy.

The Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989), set forth the standard for a claim based on a failure to train. The Court stated that "only where a failure to train reflects a deliberate or conscious choice by a municipality -- a policy as defined by our prior cases -- can a [municipality] be liable for a such a failure under § 1983." *Id*. at 389. Municipal liability is assessed under an objective standard.

*Farmer v Brennan*, 511 U.S. at 825, 841 (1994). A plaintiff who cites only her own incident has not presented sufficient evidence to establish supervisory liability for failure to train. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985).

Plaintiff's only evidence in this matter relates to the circumstances involving Plaintiff. Even if a question of fact regarding a constitutional violation is found by the Court, a single incident is insufficient because deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Board of County Comm'rs v. Brown*, 117 S.Ct. 1382, 1391 (1997). As there is no evidence that Oakland County was aware of some deficiency in training officers not to violate individual's constitutional rights, summary judgment is appropriate with respect to Plaintiff's *Monell* claim in Count III.

### D. False Arrest and False Imprisonment

Liability for false arrest and false imprisonment attaches only when the claimant is arrested without probable cause. *Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 218 (1982); *Tope v. Howe*, 179 Mich.App. 91, 105 (1989). As the Court has held that there was probable cause for Plaintiff's arrest for felonious assault, *supra*, there is no genuine issue of fact with respect to Plaintiff's claim for false arrest and imprisonment. Count IV is dismissed as a matter of law.

### E.  Assault and Battery and Intentional Infliction of Emotional Distress

An officer who commits an intentional tort is entitled to governmental immunity if he shows that "(a) the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial." *Odom v. Wayne County*, 760 N.W.2d 217, 220, 228 (Mich. 2008); *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 317 (6th Cir. 2017).

The Court finds that the record demonstrates that all individually named Defendants were acting during the course and scope of their employment, that their acts were undertaken in good faith, that the acts were discretionary and without malice. Defendants acted in good faith because every action they took was conducted with the good faith intention to safely secure and prevent Plaintiff from committing suicide while transferring her to the Oakland County Jail and her cell. Plaintiff has not set forth any evidence that Defendants acted in bad faith to support any of Plaintiff's state-law tort claims.  Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that the individually named Defendants acted with malice in the arrest, transport and incarceration of Plaintiff,

as evidenced by the audio and video recordings of the entire period from the time she was taken into custody until she was left alone in her cell.

Plaintiff also fails to establish a prima facie case of intentional infliction of emotional distress.

> To establish a prima facie case of intentional infliction of emotional distress, the plaintiff must show four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Haverbush v. Powelson,* 217 Mich. App. 228, 234, 551 N.W.2D 206 (1996). "Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id*.

*Smith v. Calvary Christian Church*, 233 Mich. App. 96 (1998). Defendants' conduct cannot be viewed as the type that rises to the level of outrageousness thought to be required to establish a tort of intentional infliction of emotional distress and summary judgment on that claim is appropriate.

The Court grants summary judgment to the individual Defendants with respect to Plaintiff's Assault and Battery and Intentional Infliction of Emotional Distress claims in Count V.

## F. Gross Negligence

Plaintiff does not object to the dismissal of her gross negligence claim and Count VI is dismissed.

## G.  Ethnic Intimidation in Violation of MCL 750.147(b)

Plaintiff submits that a reasonable juror, after: (1) learning that Plaintiff was arrested merely to "solve a problem;" (2) watching the CET video at sally port; and (3) considering all of the evidence, could reasonably conclude that the actions of the deputies were a result of ethnic intimidation.  It is true that Plaintiff is African-American, however, there is no indicia that any Defendant even took into account Plaintiff's race or ethnicity at any time.  Accordingly, there is nothing to connect any of the matters identified by Plaintiff to her race or ethnicity, and the Court dismisses her ethnic intimidation claim at Count VII as a matter of law.

## H. Civil Conspiracy

Civil conspiracy under § 1983 requires evidence of "an agreement between two or more persons to injure another by unlawful action." *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)).

The plaintiff must plead enough facts to support a reasonable inference "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id*.; *Boxill v. O'Grady*, 935 F.3d 510, 519 (6th Cir. 2019).  The Court finds that Plaintiff offers no facts to establish

that Defendants intentionally conspired to violate her constitutional rights. There is no evidence that demonstrates a joined conspiracy, shared conspiratorial objective and/or committed specific acts in furtherance of a conspiracy. *Boxill*, 935 F.3d at 519.  And, there is no evidence that an unlawful action was committed by any of the Defendants. *See Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir. 2004) ("Without an unlawful action causing injury, Appellant cannot prove the elements required to support a claim for [civil] conspiracy.").  For these reasons, summary judgment on the civil conspiracy claim in Count VIII is warranted.

## V.   CONCLUSION

For the reasons stated above,

IT IS ORDERED Defendants' Motion for Summary Judgment (ECF No. 27) is GRANTED.

IT IS FURTHER ORDERED that this action is DISMISSED with prejudice. Judgment shall be entered accordingly.


s/Denise Page Hood
DENISE PAGE HOOD
UNITED STATES DISTRICT JUDGE

Dated:  August 2, 2023